UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| AVON CAPITAL HOLDINGS, LLC, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 3:16-cv-00101-RNC |
| | : | |
| WELLS FARGO BANK, N.A. and | : | |
| HSH NORDBANK AG, | : | |
| | : | |
| Defendants. | : | JANUARY 28, 2016 |

## AMENDED COMPLAINT

Plaintiff, as and for its amended complaint against defendants pursuant to Fed. R. Civ. P. 15(a)(1), alleges as follows:

## PARTIES

1. Plaintiff Avon Capital Holdings, LLC ("Avon"), is a Delaware limited liability company. Avon's sole member is Avon Capital, LLC, a Wyoming limited liability company whose two members are Caroline Financial Group, Inc., a Delaware corporation with a principal place of business in Connecticut, and Donald Trudeau, a citizen of Connecticut.

2. Defendant Wells Fargo Bank, N.A. ("Wells Fargo"), is a national banking association organized and existing under the laws of the United States of America and is a citizen of South Dakota.

3. Defendant HSH Nordbank AG ("HSH"), is a German banking corporation with a branch located at 230 Park Avenue, 34th Floor, New York, New York 10169.

## JURISDICTION & VENUE

4. This Court has subject matter jurisdiction pursuant to 12 U.S.C. § 632 because defendant Wells Fargo is a national banking association organized under the laws of the United

1

States and this action arises out of transactions involving international or foreign banking or other international or foreign financial operations within the meaning of 12 U.S.C. § 632.

5. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(3) because this action is between citizens of different States in which a citizen or subject of a foreign state is an additional party and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

6. Venue in this district is proper pursuant to 28 U.S.C. § 1391(b)(3) because Wells Fargo is subject to this Court's personal jurisdiction with respect to this action.

**FACTS**

7. In October 2007, Life Insurance Fund Elite LLC ("Fund Elite" or the "Fund"), created and became the settlor and sole beneficiary of the Life Insurance Fund Elite Trust, a Delaware statutory trust ("Life Trust"), which was formed to invest in and hold life settlement insurance policies.

8. Generally, a life settlement is the sale of an existing life insurance policy to a third party (usually an investor such as a hedge fund like Fund Elite) for more than its cash surrender value but less than its net death benefit. There are a number of reasons why the original policy owner may want to sell her life insurance policy. She may no longer want or need the policy, she may wish to purchase a different kind of policy, she may no longer be able to afford the premium payments, or she may need to generate cash for unexpected medical, long-term care, or other needs. A life settlement is beneficial for the original policy owner because she will receive much more money for the policy than she would if she merely surrendered it back to the insurance company that issued the policy or allowed the policy to lapse for non-payment of premiums.

9. In 2009, the U.S. Senate Special Committee on Aging conducted a study and found that, on average, life settlements yield 8x more to the policy owner than the cash surrender value

offered by life insurance companies. In June 2013, a London Business School study found that life settlements typically generate more than 4x to the policy owner than the cash surrender value or allowing the policy to lapse.

10. The party that purchases the life settlement policy (such as Fund Elite) then is required to make the premium payments on the policy or the policy will lapse and become worthless. Investors who purchase life settlement policies undertake a complex financial and mortality analysis to maximize the probability that the future net death benefit will exceed the cash spent to buy the policy and pay premiums until the insured dies. Many times life settlement policies are bought and sold between various life settlement investors such as Fund Elite long after the initial life settlement transaction has been consummated with the original policy owner.

11. Pursuant to a loan and security agreement dated October 12, 2007, HSH agreed to provide a $150 million secured line of credit to Fund Elite in order to finance the purchase of, and pay premiums on, life settlement policies to be placed and held in the Life Trust.

12. The life settlements market suffered during the 2008 financial crisis and ensuing recession, when lending dried up for hedge funds, which were among the biggest buyers of life settlement policies. The market has remained depressed, as life expectancies used by investors several years ago to gauge potential returns have repeatedly proved wrong as insureds are generally living longer than their actuarial life expectancies would indicate.

13. In April 2009, Wells Fargo became the trustee of the Life Trust and remains so to this day.

14. As with other players in the life settlements market, the Fund began to suffer serious financial problems after 2008. In 2010, the Fund incurred a net loss of $11 million.

15. In 2010, the Fund's original investors wanted to get cashed out of the Fund. The Life Trust also needed more assets (in the form of additional life settlement policies) so that the

Fund would not run afoul of its borrowing covenants with its secured lender HSH. The Fund also needed additional liquidity with which to pay the millions of dollars in annual premiums necessary to keep the insurance policies held in the Life Trust from lapsing.

16. In November 2010, a two-step restructuring of the Fund was set in motion. The first step of the Fund's restructuring involved Avon's sole member contributing $60 million worth of life settlement policies (having a face amount, or death benefit, in excess of $250 million) to the Life Trust. As part of this first step of the Fund's restructuring, Wells Fargo transferred $35 million in cash to the Fund's existing investors to buy them out of the Fund, resulting in Avon owning 100% of the Fund (*i.e.*, 100% of Fund Elite's membership interests). Avon also received an additional $25 million in notional (*i.e.*, accounting or book-entry) value in the form of an increase in its capital account at the Fund.

17. As a result of this first step of the Fund's restructuring, the Fund received all of the new Avon policies and swapped out its prior owners with Avon – who obviously had much more of a vested interest in the Fund's viability and future success since it had just placed a large number of policies in the Life Trust which the Fund managed. More importantly, by receiving the new Avon policies, the Fund (on behalf of the Life Trust) was able to avoid (at least initially) running afoul of its borrowing covenants with HSH and could keep its HSH credit line open — without which the premiums could not be paid on *any* of the policies in the Life Trust (*i.e.*, Avon as well as non-Avon policies) and they would lapse and become worthless.

18. But the parties that received the best deal out of the first step of the Fund's restructuring were the trustee of the Life Trust (Wells Fargo), through the payment of additional fees, and the Fund's secured lender (HSH) through additional Fund borrowings and the resulting increased interest earned and commitment fees paid.

19. The second step of the Fund's restructuring involved bringing in a new investor that would provide the necessary equity funding that was required by HSH in order to keep the Fund's $150 million credit line open.

20. As part of the process of bringing a new equity investor into the Fund, the life settlement policies contributed by Avon's sole member had to be approved by HSH as sufficient collateral to keep the credit line open.

21. However, HSH kept dragging its feet and changing the criteria that the submitted policies needed to satisfy. As a result, a process that should have taken two months ended up taking two years ― all the while HSH refused to allow additional borrowings under the credit line.

22. Many of the policies held by the Life Trust began to lapse because the Fund did not have sufficient liquidity to pay the millions of dollars in annual premiums necessary to keep those policies in force.

23. Because premiums had to be paid on all of the Life Trust's policies in the meanwhile, the Fund sought other investors to provide the liquidity that was no longer forthcoming from HSH (who required additional equity in the Fund before releasing more cash from the credit facility). Several attempts to raise additional equity in the Fund all failed.

24. This resulted in the Fund becoming illiquid but still being required to pay premiums on the Life Trust's policies. The lack of funding ultimately led in January 2013 to the Fund, without Avon's knowledge or consent, consummating a "peaceful possession" of the collateral under the credit facility (*i.e.*, the life settlement policies held in the Life Trust) to Wells Fargo and HSH.

25. Specifically, pursuant to an agreement dated January 23, 2013, between and among the Fund, the Fund's manager, Wells Fargo and HSH (the "Peaceful Possession Agreement"), the

Fund surrendered to Wells Fargo and HSH all the Fund's rights as settlor and sole beneficiary of the Life Trust.

26. More specifically, pursuant to the Peaceful Possession Agreement, the Fund authorized Wells Fargo and HSH to take any action with respect to the Life Trust in general and with respect to all of the life settlement policies held in the Life Trust in particular.

27. Even though Avon owned 100% of the Fund at the time (and still does), and even though the Fund was the sole beneficiary of the Life Trust (and still is), the Peaceful Possession Agreement was executed by Wells Fargo and HSH without the knowledge or consent of Avon.

28. Had Avon known that Wells Fargo and HSH were about to execute the Peaceful Possession Agreement, Avon could and would have taken appropriate legal action to safeguard its interest in the Fund and the Life Trust. Instead, the Peaceful Possession Agreement was executed behind Avon's back.

29. Even worse, however, is that after taking over the Fund and the Life Trust, Wells Fargo and HSH allowed life settlement policies worth over $60 million and having a face amount in excess of $250 million to lapse.

30. As a result, Avon's interest in the Fund has been rendered worthless or nearly so.

31. HSH has provided directions to Wells Fargo to take and/or refrain from taking various actions with respect to the Life Trust. These directions have caused, and continue to cause, Avon damage.

## COUNT I
## BREACH OF FIDUCIARY DUTY

32. Avon repeats and re-alleges the allegations set forth in paragraphs 1 through 31 of this Complaint as if fully set forth herein.

33. As the Fund's 100% owner, Avon is the ultimate sole beneficiary of the Life Trust.

6

34. A fiduciary relationship exists between and among Avon, the Fund, the Life Trust, Wells Fargo and HSH.

35. That fiduciary relationship is characterized by a unique degree of trust and confidence as a result of the existence of an express trust in which all parties play a role.

36. As trustee of the Life Trust and as the party giving direction to the trustee of the Life Trust, Wells Fargo and HSH, respectively, have superior knowledge, skill and expertise, and are under a duty thereby to represent the interests of Avon as the ultimate sole beneficiary of the Life Trust.

37. By entering into the Peaceful Possession Agreement without Avon's knowledge or consent and/or by allowing many if not most of the Life Trust's policies to lapse, Wells Fargo and HSH breached that duty causing harm to Avon.

38. Avon has suffered damages in the amount of at least $60 million.

## COUNT II
## CONSTRUCTIVE FRAUD

39. Avon repeats and re-alleges the allegations set forth in paragraphs 1 through 38 of this Complaint as if fully set forth herein.

40. A confidential or special relationship existed between and among Avon, the Fund, the Life Trust, Wells Fargo and HSH.

41. By entering into the Peaceful Possession Agreement without Avon's knowledge or consent and/or by allowing many if not most of the Life Trust's policies to lapse, Wells Fargo and HSH breached that relationship causing harm to Avon.

42. The breach of this confidential or special relationship forms the basis of an action for constructive fraud.

43. Avon has suffered damages in the amount of at least $60 million.

## COUNT III
## NEGLIGENCE

44. Avon repeats and re-alleges the allegations set forth in paragraphs 1 through 43 of this Complaint as if fully set forth herein.

45. Wells Fargo and HSH owed a duty to Avon.

46. By entering into the Peaceful Possession Agreement without Avon's knowledge or consent and/or by allowing many if not most of the Life Trust's policies to lapse, Wells Fargo and HSH breached that duty causing harm to Avon.

47. Avon has suffered actual injury as a result of that breach.

48. Avon has suffered damages in the amount of at least $60 million.

## COUNT IV
## CONNECTICUT UNFAIR TRADE PRACTICES ACT ("CUTPA")
## (CONN. GEN. STAT. §§ 42-110a, *et seq.*)

49. Avon repeats and re-alleges the allegations set forth in paragraphs 1 through 48 of this Complaint as if fully set forth herein.

50. At all times relevant hereto, Wells Fargo and HSH were engaged in the conduct of trade or commerce.

51. By entering into the Peaceful Possession Agreement without Avon's knowledge or consent and/or by allowing many if not most of the Life Trust's policies to lapse, Wells Fargo and HSH engaged in flagrant, unfair and deceptive acts, and these acts were done in bad faith and with an intent to inflict substantial economic harm on Avon.

52. The flagrant and bad faith conduct of Wells Fargo and Avon occurred where no confusion existed about the rights and duties of the parties.

53. The flagrant and bad faith acts of Wells Fargo and HSH constitute unfair or deceptive acts or practices in the conduct of any trade or commerce in violation of Conn. Gen. Stat. § 42-110b(a) (the "CUTPA Violations").

54. The CUTPA Violations occurred primarily and substantially in Connecticut and/or Avon suffered the effects of the CUTPA Violations in Connecticut.

55. The CUTPA Violations are immoral, unethical, oppressive or unscrupulous.

56. As a result of the CUTPA Violations, Avon has suffered an ascertainable loss of money or property.

57. The CUTPA Violations were performed willfully and knowingly.

58. The CUTPA Violations are the proximate cause of Avon's damages.

59. As a result of the CUTPA Violations, Avon has suffered actual damages of at least $60 million.

60. Pursuant to Conn. Gen. Stat. §§ 42-110g(a) and (d), Avon is entitled to treble damages of at least $180 million, plus attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff Avon respectfully demands judgment against Wells Fargo and HSH, jointly and severally, and an award of the following:

A. Compensatory damages of at least $60 million;

B. Statutory treble damages of at least $180 million;

C. Attorney's fees and costs;

D. Pre-judgment interest; and

E. Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Avon hereby demands a trial by jury on all issues in this Complaint so triable.

**AVON CAPITAL HOLDINGS, LLC**

_____
Jack E. Robinson (ct16022)
LEYDEN & MAIN LEGAL GROUP, P.C.
25 Seir Hill Road
Norwalk, CT 06850
(203) 905-1970
(866) 941-4617 (fax)
robinsonesq@aol.com