# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| AVON CAPITAL HOLDINGS, LLC, and AVON CAPITAL, LLC, | : : : | |
| Plaintiffs, | : : | |
| v. | : : | Civil Action No. 3:16-cv-00101-RNC |
| HSH NORDBANK AG, and STROOCK STROOCK & LAVAN LLP, | : : : | |
| Defendants. | : | APRIL 25, 2016 |

## SECOND AMENDED COMPLAINT

Plaintiffs, as and for their second amended complaint against defendants pursuant to Fed. R. Civ. P. 15(a)(2), allege as follows:

## PARTIES

1. Plaintiff Avon Capital Holdings, LLC ("Avon Holdings"), is a Delaware limited liability company whose sole member is co-plaintiff Avon Capital, LLC. As described below, Avon Holdings is a citizen of Delaware and Connecticut.

2. Co-plaintiff Avon Capital, LLC ("Avon Capital"), is a Wyoming limited liability company whose two members are Caroline Financial Group, Inc., a Delaware corporation with a principal place of business in Connecticut, and Donald Trudeau, a citizen of Connecticut. Consequently, Avon Capital is a citizen of Delaware and Connecticut.

3. Defendant HSH Nordbank AG ("HSH"), is a German banking corporation with a branch located at 230 Park Avenue, 34th Floor, New York, New York 10169.

4. Defendant Stroock Stroock & Lavan LLP ("Stroock"), is a New York registered limited liability partnership engaged in the practice of law having a principal office located at 180 Maiden Lane, New York, New York 10038. Upon information and belief, Stroock has no partners who are citizens of Delaware or Connecticut.

**JURISDICTION & VENUE**

5. Subject matter jurisdiction exists pursuant to the Edge Act, 12 U.S.C. § 632, because this is a civil suit, an original (but former) defendant is a federally chartered corporation, and this action arises out of transactions involving international or foreign banking or out of international or foreign financial operations.

6. Subject matter jurisdiction also exists pursuant to 28 U.S.C. § 1332(a)(2) because this is a civil action between citizens of a State and citizens or subjects of a foreign state, and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

7. Subject matter jurisdiction also exists pursuant to 28 U.S.C. § 1332(a)(3) because this is a civil action between citizens of different States in which citizens or subjects of a foreign state are additional parties, and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

8. Venue in this district is proper pursuant to 28 U.S.C. § 1391(b)(1) because all defendants reside in this district pursuant to 28 U.S.C. § 1391(c)(2). Venue in this district is also proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

9. Alternatively, if there is no district in which this action may otherwise be brought, venue in this district is proper pursuant to 28 U.S.C. § 1391(b)(3) because either or both defendants are subject to this Court's personal jurisdiction.

# FACTS

## A. Formation of Fund Elite & Investment in Life Settlements

10. In October 2007, Life Insurance Fund Elite LLC ("Fund Elite"), created and became the settlor and sole beneficiary of the Life Insurance Fund Elite Trust ("Trust"), a Delaware statutory trust. Fund Elite created the Trust to hold all of the life settlement insurance policies acquired by Fund Elite.

11. Generally, a life settlement is the sale of an existing life insurance policy to a third party (usually an investor such as a hedge fund like Fund Elite) for more than its cash surrender value but less than its net death benefit. There are a number of reasons why the original policy owner may want to sell her life insurance policy. She may no longer want or need the policy, she may wish to purchase a different kind of policy, she may no longer be able to afford the premium payments, or she may need to generate cash for unexpected medical, long-term care, or other needs. A life settlement is beneficial for the original policy owner because she will receive much more money for the policy than she would if she merely surrendered it back to the insurance company that issued the policy or allowed the policy to lapse for non-payment of premiums.

12. In 2009, the U.S. Senate Special Committee on Aging conducted a study and found that, on average, life settlements yield 8x more to the policy owner than the cash surrender value offered by life insurance companies. In June 2013, a London Business School study found that life settlements typically generate more than 4x to the policy owner than the cash surrender value.

13. The party that purchases the life settlement policy (such as Fund Elite) then is required to make the premium payments on the policy or the policy will lapse and become worthless. Investors who purchase life settlement policies undertake a complex financial and mortality analysis to maximize the probability that the future net death benefit will exceed the cash

spent (including the time value of money) to buy the policy and pay premiums until the insured dies. Many times life settlement policies are bought and sold between and among various life settlement investors such as Fund Elite long after the initial life settlement transaction has been consummated with the original policy owner.

14. Pursuant to a loan and security agreement dated October 12, 2007 (the "HSH Loan Agreement"), HSH agreed to provide a $150 million secured line of credit to Fund Elite in order to finance the purchase of, and pay premiums on, life settlement policies to be placed and held in the Trust.

15. Section 11.2 of the HSH Loan Agreement provides that all notices to HSH are to be sent to it at its London address and all notices to Fund Elite are to be sent to it at its New York address.

16. Section 11.2 of the HSH Loan Agreement also indicates that Stroock advised and represented HSH with respect to the HSH Loan Agreement.

### B. Avon's Participation in the Restructuring of Fund Elite

17. The life settlements market suffered greatly during the 2008 Financial Crisis and ensuing Great Recession, when available capital dried up for hedge funds ― which were among the biggest buyers of life settlement policies. Since then, the market for life settlements has remained depressed, as life expectancies used by investors several years ago to gauge potential returns have repeatedly been proven wrong as insureds are generally living significantly longer than their actuarial life expectancies computed several years ago would indicate.

18. As with other participants in the life settlements market, Fund Elite began to suffer serious financial problems after 2008. In 2010, Fund Elite incurred a net loss of $11 million.

19. In 2010, Fund Elite's original investors wanted to get cashed out of Fund Elite. The Trust also needed more assets (in the form of additional life settlement policies) so that Fund Elite would not run afoul of its borrowing covenants with its secured lender HSH. Fund Elite also needed additional liquidity with which to pay the millions of dollars in annual premiums necessary to keep the insurance policies held in the Trust from lapsing. As a result, a restructuring of Fund Elite's ownership, capitalization and operations was set into motion.

20. In anticipation of participating in this planned restructuring of Fund Elite, Avon Capital executed a retainer agreement with Stroock dated November 15, 2010, whereby Stroock agreed to represent Avon Capital "in connection with the restructuring of Life Insurance Fund Elite."

21. Stroock did not advise Avon Capital at the time that it also represented HSH with respect to the HSH Loan Agreement. As a result (and as described in further detail below), Stroock agreed to represent both the lender and the ultimate borrower in the same transaction ― without disclosing this obvious conflict of interest to Avon Capital.

22. In November 2010, the two-step restructuring of Fund Elite began. The first step of the restructuring involved Avon Capital contributing $60 million worth of life settlement insurance policies (having a face amount, or death benefit, in excess of $250 million) to the Trust.

23. As part of this first step of Fund Elite's restructuring, $35 million in cash was transferred to Fund Elite's existing investors to buy them out of Fund Elite, resulting in Avon Holdings (a 100%-owned subsidiary of Avon Capital) owning 100% of the equity (or membership interests) of Fund Elite. Avon Holdings also received an additional $25 million in notional (*i.e.*, accounting or book-entry) value in the form of an increase in its capital account at Fund Elite.

24. As a result of this first step of Fund Elite's restructuring, Fund Elite received all of the new life settlement policies from Avon Capital and swapped out its prior owners with Avon Holdings.

25. More importantly, by receiving the new life settlement policies from Avon Capital, Fund Elite was able to avoid (at least initially) running afoul of its borrowing covenants with HSH and could keep its HSH credit line open — without which the premiums could not be paid on *any* of the policies in the Trust (*i.e.*, Avon as well as non-Avon policies) and they would lapse and become worthless.

26. But the parties that received the best deal out of the first step of Fund Elite's restructuring were HSH — Fund Elite's secured lender (through additional borrowings and the resulting increased interest earned and commitment fees paid); and Stroock — who received legal fees from Avon Capital on one side of the transaction and (unbeknownst to Avon Capital) from HSH on the other side of the same transaction.

27. The second step of Fund Elite's restructuring involved bringing in a new investor that would provide the necessary equity funding that was required by HSH in order to keep Fund Elite's $150 million credit line open.

28. As part of the process of bringing a new equity investor into Fund Elite, the life settlement policies contributed by Avon Capital had to be approved by HSH as sufficient collateral to keep the credit line open.

29. However, HSH kept dragging its feet and changing the criteria that the submitted policies needed to satisfy. As a result, a process that should have taken two months ended up taking two years — all the while HSH refused to allow additional borrowings under the credit line.

### C. "Peaceful Possession" of Fund Elite by HSH

30. As a result of HSH's foot-dragging, many of the life settlement policies held by the Trust began to lapse because Fund Elite did not have sufficient liquidity to pay the millions of dollars in annual premiums necessary to keep those policies in force.

31. Because premiums had to be paid on all of the policies held by the Trust in the meanwhile, Fund Elite sought other investors to provide the liquidity that was no longer forthcoming from HSH (who required additional equity investment in Fund Elite before releasing more cash from the credit facility). Several attempts to raise additional equity in Fund Elite all failed.

32. This resulted in Fund Elite becoming illiquid but still being required to pay premiums on the Trust's life settlement policies. The lack of funding ultimately led in January 2013 to Fund Elite, without the knowledge or consent of Avon Capital or Avon Holdings, agreeing to a "peaceful possession" by HSH of the collateral under the credit facility (*i.e.*, the life settlement policies held in the Trust).

33. Specifically, pursuant to an agreement dated January 23, 2013, between and among, *inter alia*, Fund Elite and HSH (the "Peaceful Possession Agreement"), Fund Elite surrendered to HSH all of Fund Elite's rights as settlor and sole beneficiary of the Trust.

34. More specifically, pursuant to the Peaceful Possession Agreement, Fund Elite authorized HSH to take any action with respect to the Trust in general and with respect to all of the life settlement policies held in the Trust in particular.

35. Even though Avon Holdings owned 100% of Fund Elite at the time (and still does), and even though Fund Elite was the sole beneficiary of the Trust (and still is), the Peaceful Possession Agreement was executed without the knowledge or consent of Avon Holdings.

36. Upon information and belief, Stroock represented HSH in connection with the Peaceful Possession Agreement but did not disclose that fact to Avon Capital.

37. Had Avon Capital and/or Avon Holdings known that HSH was about to execute the Peaceful Possession Agreement, they could and would have taken appropriate legal action to safeguard Avon Holdings' interest in Fund Elite and the Trust. Instead, the Peaceful Possession Agreement was executed behind the backs of both Avon Capital and Avon Holdings.

38. Even worse, however, is that after taking over Fund Elite and the Trust, HSH allowed life settlement policies worth over $60 million and having a face amount in excess of $250 million to lapse and become worthless (or nearly so).

39. As a result, Avon Holdings' 100% ownership interest in Fund Elite, initially valued in the amount of at least $60 million, has been rendered worthless (or nearly so).

40. HSH has taken and/or refrained from taking certain actions with respect to Fund Elite and the Trust. These actions have caused, and continue to cause, damage to both Avon Capital and Avon Holdings.

**D.    The Arbitration**

41. In April 2014, the Trust filed a demand for arbitration against Avon Capital with the American Arbitration Association.

42. The arbitration demand alleged that pursuant to a Life Settlements Purchase and Sales Agreement dated November 15, 2010, by and between the Trust and Avon Capital (the "Purchase Agreement"), Avon Capital was required to deliver to the Trust life settlement policies having a value of $60 million that satisfied certain terms and conditions of the Purchase Agreement, but that Avon Capital breached its obligations under the Purchase Agreement and related bills of sale by failing to deliver compliant policies.

43. Avon Capital's defense to the arbitration allegations was, essentially, that the Purchase Agreement and related bills of sale regarding certain life settlement policies were only part of the intended overall restructuring of Fund Elite, which ultimately failed when the new equity financing did not materialize. Most fundamentally, when the financing portion of Fund Elite's restructuring did not occur, and in particular when Fund Elite did not receive the financing to pay policy premiums to keep the policies in the Trust's portfolio in force, the overall transaction failed of its essential purpose, freeing Avon Capital of whatever responsibilities and potential liabilities it might have otherwise had under the Purchase Agreement and related bills of sale.

44. After a full evidentiary hearing and multiple rounds of briefing, the arbitrator issued his final award on February 25, 2016 ("Award").

45. The Award found that "based on the clear and unequivocal language of the Purchase Agreement," Avon Capital is liable to the Trust in the total amount (including interest, fees and costs) of **$86,271,421.18**.

46. Stroock represented Avon Capital during the negotiations regarding and in connection with the Purchase Agreement and related bills of sale.

47. The Award was based on the finding by the arbitrator that the Purchase Agreement and related bills of sale were not made expressly contingent upon a successful restructuring of Fund Elite.

48. Specifically, in the Award the arbitrator found as follows:

> "Avon's obligations under the Purchase Agreement could have been conditioned on the availability of the HSH credit facility; the Trust could have been made responsible to clear the Policies for compliance with the Policy Requirements established by the Purchase Agreement before that Agreement was made effective or the Trust and Avon could have shared that responsibility; or Avon could have been excused from performance under the Purchase Agreement to the extent the anticipated credit did not materialize, to name a few possible approaches the Parties could have taken. *Instead, the Purchase Agreement and Bills of Sale were structured on a stand-alone basis, in no way providing protection to Avon if the Policies turned out to be unacceptable to HSH because of noncompliance with the Policy Requirements under the Purchase Agreement or otherwise or if the Trust ran into financial difficulties for other reasons.*

Award at p. 23 (emphasis added).

49. Stroock represented Avon Capital with respect to and in connection with the Purchase Agreement and related bills of sale, and failed to protect Avon Capital's interests in the manner discussed in the Award (and otherwise).

50. Specifically, Stroock very easily could have advised Avon Capital to require, as a term of the Purchase Agreement and related bills of sale, that the risks of the transaction be contractually imposed upon or shared with the Trust.

51. Stroock also could have ensured that the Purchase Agreement and related bills of sale were expressly conditioned upon a successful restructuring of Fund Elite.

52. Instead, Stroock took none of these actions and failed miserably to protect Avon Capital's interests in this matter because it (Stroock) was secretly also advising and/or representing HSH in the same transaction.

## COUNT I
## BREACH OF FIDUCIARY DUTY
## (against HSH)

53. Plaintiffs repeat and re-allege the allegations set forth in the foregoing paragraphs of this Complaint as if fully set forth herein.

54. As Fund Elite's 100% owner, Avon Holdings is the ultimate sole beneficiary of the Trust.

55. A fiduciary relationship exists between and among Avon Holdings, Fund Elite, the Trust, and HSH.

56. That fiduciary relationship is characterized by a unique degree of trust and confidence as a result of the existence of an express trust in which all parties play a role.

57. HSH has superior knowledge, skill and expertise, and is under a duty thereby to represent the interests of Avon Holdings as the ultimate sole beneficiary of the Trust.

58. By entering into the Peaceful Possession Agreement without the knowledge or consent of Avon Holdings and/or by allowing many if not most of the Trust's policies to lapse, HSH breached that duty causing harm to Avon Holdings.

59. Avon Holdings has suffered damages in the amount of at least $60 million.

## COUNT II
## CONSTRUCTIVE FRAUD
## (against HSH)

60. Plaintiffs repeat and re-allege the allegations set forth in the foregoing paragraphs of this Complaint as if fully set forth herein.

61. A confidential or special relationship existed between and among Avon Holdings, Fund Elite, the Trust and HSH.

62. By entering into the Peaceful Possession Agreement without the knowledge or consent of Avon Holdings and/or by allowing many if not most of the Trust's policies to lapse, HSH breached that relationship causing harm to Avon Holdings.

63. The breach of this confidential or special relationship forms the basis of an action for constructive fraud and Avon Holdings has suffered actual injury as a result thereof.

64. Avon Holdings has suffered damages in the amount of at least $60 million.

## COUNT III
## NEGLIGENCE
## (against HSH)

65. Plaintiffs repeat and re-allege the allegations set forth in the foregoing paragraphs of this Complaint as if fully set forth herein.

66. HSH owed a duty to Avon Holdings.

67. By entering into the Peaceful Possession Agreement without the knowledge or consent of Avon Holdings and/or by allowing many if not most of the Trust's policies to lapse, HSH breached that duty causing harm to Avon Holdings.

68. Avon Holdings has suffered actual injury as a result of that breach.

69. Avon Holdings has suffered damages in the amount of at least $60 million.

## COUNT IV
## BREACH OF DUTY OF CARE
## (against HSH)

70. Plaintiffs repeat and re-allege the allegations set forth in the foregoing paragraphs of this Complaint as if fully set forth herein.

71. Pursuant to Section 9.1(a) of the HSH Loan Agreement, HSH agreed that it would be liable for "acts or omissions that constitute willful misconduct, bad faith, gross negligence or reckless disregard of any obligation or duty or breach of fiduciary duty."

72. HSH owed a duty of care to Avon Holdings.

73. HSH breached that duty of care and acted with willful misconduct, bad faith, gross negligence or reckless disregard of any obligation or duty or breach of fiduciary duty.

74. Avon Holdings has suffered actual injury as a result of that breach.

75. Avon Holdings has suffered damages in the amount of at least $60 million.

# COUNT V
# PROFESSIONAL MALPRACTICE
# (against Stroock)

76. Plaintiffs repeat and re-allege the allegations set forth in the foregoing paragraphs of this Complaint as if fully set forth herein.

77. An attorney-client relationship existed between Stroock and Avon Capital with respect to Fund Elite, the Trust, the Purchase Agreement and related bills of sale, and all other matters concerning Fund Elite's restructuring (collectively, the "Fund Elite Matters").

78. Stroock failed to exercise the requisite standard of professional care in its representation of Avon Capital with respect to the Fund Elite Matters.

79. Stroock committed various wrongful acts and omissions with respect to its representation of Avon Capital in the Fund Elite Matters including, but not limited to, its failure to disclose to Avon Capital that it also represented HSH with respect to the Fund Elite Matters.

80. Stroock's wrongful acts and omissions are the proximate cause of Avon Capital's damages in general, and the damages contained in the Award in particular.

81. Avon Capital has suffered damages in the amount of at least $86.3 million.

# COUNT VI
# NEGLIGENCE
# (against Stroock)

82. Plaintiffs repeat and re-allege the allegations set forth in the foregoing paragraphs of this Complaint as if fully set forth herein.

83. Stroock owed a duty to Avon Capital.

84. By representing both Avon Capital and HSH concerning the Fund Elite Matters, Stroock breached that duty causing harm to Avon Capital.

85. Avon Capital has suffered actual injury as a result of that breach.

86. Avon Capital has suffered damages in the amount of at least $86.3 million.

### COUNT VII
### BREACH OF CONTRACT
### (against Stroock)

87. Plaintiffs repeat and re-allege the allegations set forth in the foregoing paragraphs of this Complaint as if fully set forth herein.

88. Avon Capital and Stroock entered into a legal representation agreement dated November 15, 2010 (the "Retainer Agreement").

89. Avon Capital performed its obligations under the Retainer Agreement.

90. Stroock breached the Retainer Agreement by failing adequately and robustly to represent Avon Capital's interests with respect to the Fund Elite Matters and by failing to disclose that it also represented HSH adversely to Avon Capital in certain of the Fund Elite Matters.

91. Avon Capital has suffered actual injury as a result of these breaches.

92. Avon Capital has suffered damages in the amount of at least $86.3 million.

### COUNT VIII
### COMMON-LAW INDEMNIFICATION
### (against HSH & Stroock)

93. Plaintiffs repeat and re-allege the allegations set forth in the foregoing paragraphs of this Complaint as if fully set forth herein.

94. HSH and Stroock were negligent with respect to the Fund Elite Matters.

95. The negligence of HSH and Stroock, rather than that of plaintiffs, was the direct, immediate and proximate cause of plaintiffs' injuries.

96. HSH and Stroock were in control of the situation to the exclusion of plaintiffs.

97. Plaintiffs did not know of such negligence, had no reason to anticipate it, and could reasonably rely on HSH and Stroock not to be negligent.

98. Plaintiffs have suffered actual injury as a result of the negligence of HSH and Stroock.

99. Plaintiffs have suffered damages collectively in the amount of at least $146.3 million.

## COUNT IX
## CIVIL CONSPIRACY
## (against HSH & Stroock)

100. Plaintiffs repeat and re-allege the allegations set forth in the foregoing paragraphs of this Complaint as if fully set forth herein.

101. Unbeknownst to Plaintiffs, HSH and Stroock entered into a combination between themselves with respect to the Fund Elite Matters.

102. Said combination was formed to do unlawful acts or lawful acts by unlawful means such as furthering the interests of HSH at the expense of the Plaintiffs while supposedly representing and/or owing a duty to Plaintiffs (the "scheme") with the purpose of maximizing profits for HSH and Stroock and minimizing HSH's potential losses with respect to the Fund Elite Matters (the "object").

103. These acts were done by HSH and Stroock pursuant to the scheme and in furtherance of the object.

104. Plaintiffs have suffered actual injury as a result of these acts.

105. Plaintiffs have suffered damages collectively in the amount of at least $146.3 million.

## COUNT X
## CONNECTICUT UNFAIR TRADE PRACTICES ACT ("CUTPA")
## (CONN. GEN. STAT. §§ 42-110a, *et seq.*)
## (against HSH & Stroock)

106. Plaintiffs repeat and re-allege the allegations set forth in the foregoing paragraphs of this Complaint as if fully set forth herein.

107. At all times relevant hereto with respect to the Fund Elite Matters, HSH and Stroock were engaged in the conduct of trade or commerce in Connecticut.

108. By entering into the Peaceful Possession Agreement without the knowledge or consent of Avon Holdings and/or by allowing many if not most of the Trust's policies to lapse, HSH engaged in flagrant, unfair and deceptive acts, and these acts were done in bad faith and with an intent to inflict substantial economic harm on Avon Holdings.

109. By committing egregious breaches of contract and violating various legal and ethical duties owed to Avon Capital, Stroock engaged in flagrant, unfair and deceptive acts, and these acts were done in bad faith and with an intent to inflict substantial economic harm on Avon Capital.

110. By engaging in a civil conspiracy by means of the scheme and with the goal of obtaining the object, HSH and Stroock engaged in flagrant, unfair and deceptive acts, and these acts were done in bad faith and with an intent to inflict substantial economic harm on the plaintiffs.

111. This flagrant and bad faith conduct occurred where no confusion existed about the rights and duties of the parties.

112. These flagrant and bad faith acts constitute unfair or deceptive acts or practices in the conduct of any trade or commerce in violation of Conn. Gen. Stat. § 42-110b(a) (the "CUTPA Violations").

113. The CUTPA Violations occurred primarily and substantially in Connecticut and/or plaintiffs suffered the effects of the CUTPA Violations in Connecticut.

114. The CUTPA Violations are immoral, unethical, oppressive or unscrupulous.

115. As a result of the CUTPA Violations, plaintiffs have suffered an ascertainable loss of money or property.

116. The CUTPA Violations were performed willfully and knowingly.

117. The CUTPA Violations are the proximate cause of plaintiffs' damages.

118. As a result of the CUTPA Violations, plaintiffs have suffered collectively actual damages of at least $146.3 million.

119. Pursuant to Conn. Gen. Stat. §§ 42-110g(a) and (d), plaintiffs are entitled to treble damages of at least $439 million, plus attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully demand judgment against HSH and Stroock, jointly and severally, and an award of the following:

A. Compensatory damages of at least $146.3 million;

B. Statutory treble damages of at least $439 million;

C. Attorney's fees and costs;

D. Pre-judgment interest; and

E. Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues in this Complaint so triable.

                            **AVON CAPITAL HOLDINGS, LLC and AVON CAPITAL, LLC**

*/s/ Jack E. Robinson*

Jack E. Robinson (ct16022)
LEYDEN & MAIN LEGAL GROUP, P.C.
25 Seir Hill Road
Norwalk, CT 06850
(203) 905-1970
(866) 941-4617 (fax)
robinsonesq@aol.com